**JOAN MCPHEE\*** (NY SBN 2082246) (joan.mcphee@ropesgray.com)
**ALEXANDER B. SIMKIN\*** (NY SBN 4463691) (alexander.simkin@ropesgray.com)
**HELEN GUGEL\*** (NY SBN 4910105) (helen.gugel@ropesgray.com)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000

**NICOLE HOROWITZ** (SBN 306828) (nicole.horowitz@ropesgray.com)
**ROPES & GRAY LLP**
Three Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 315-6300

Counsel for Plaintiff-Petitioners
*Additional counsel listed on following page*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jacinto Victor ALVAREZ, Joseph BRODERICK, Marlene CANO, Jose CRESPO-VENEGAS, Noe GONZALEZ-SOTO, Victor LARA-SOTO, Racquel RAMCHARAN, George RIDLEY, Michael Jamil SMITH, Leopoldo SZURGOT, Jane DOE, on behalf of themselves and those similarly situated.<br>      Plaintiff-Petitioners,<br><br>v.<br><br>Christopher J. LAROSE, Senior Warden, Otay Mesa Detention Center,<br><br>Steven C. STAFFORD, United States Marshal for the Southern District of California,<br><br>Donald W. WASHINGTON, Director of the United States Marshals Service.<br>      Defendant-Respondents. | **Case No.** 3:20-cv-00782-DMS-AHG<br><br>**REPLY IN SUPPORT OF PETITIONERS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Hon. Dana M. Sabraw<br>DATE: May 5, 2020<br>TIME: 1:30 PM |

**SIRINE SHEBAYA*** (NY SBN 5094990) (sirine@nipnlg.org)
**MATTHEW VOGEL*** (LA SBN 35363) (matt@nipnlg.org)
**NATIONAL IMMIGRATION PROJECT**
**THE NATIONAL LAWYERS GUILD**
2201 Wisconsin Ave, NW, Suite 200
Washington, DC  20007
Telephone: (617) 227-9727

**MITRA EBADOLAHI** (SBN 275157) (mebadolahi@aclusandiego.org)
**BARDIS VAKILI** (SBN 247783) (bvakili@aclusandiego.org)
**SARAH THOMPSON** (SBN 323188) (sthompson@aclusandiego.org)
**DAVID LOY** (SBN 229235) (davidloy@aclusandiego.org)
**ACLU FOUNDATION OF SAN DIEGO &**
**IMPERIAL COUNTIES**
P.O. Box 87131
San Diego, CA  92138-7131
Telephone: (619) 398-4187

**GABRIEL ARKLES*** (NY SBN 4391918) (garkles@aclu.org)
**CLARA SPERA*** (NY SBN 5590229) (cspera@aclu.org)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY  10014
Telephone: (212) 549-2569

*Admitted *pro hac vice* / application for admission *pro hac vice* pending

**SIRINE SHEBAYA*** (NY SBN 5094990) (sirine@nipnlg.org)
**MATTHEW VOGEL*** (LA SBN 35363) (matt@nipnlg.org)
**NATIONAL IMMIGRATION PROJECT**
**THE NATIONAL LAWYERS GUILD**
2201 Wisconsin Ave, NW, Suite 200
Washington, DC  20007
Telephone: (617) 227-9727

**MITRA EBADOLAHI** (SBN 275157) (mebadolahi@aclusandiego.org)
**BARDIS VAKILI** (SBN 247783) (bvakili@aclusandiego.org)
**SARAH THOMPSON** (SBN 323188) (sthompson@aclusandiego.org)
**DAVID LOY** (SBN 229235) (davidloy@aclusandiego.org)
**ACLU FOUNDATION OF SAN DIEGO &**
**IMPERIAL COUNTIES**
P.O. Box 87131
San Diego, CA  92138-7131
Telephone: (619) 398-4187

**GABRIEL ARKLES*** (NY SBN 4391918) (garkles@aclu.org)
**CLARA SPERA*** (NY SBN 5590229) (cspera@aclu.org)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY  10014
Telephone: (212) 549-2569

*Admitted *pro hac vice* / application for admission *pro hac vice* pending

**Table of Contents**

**INTRODUCTION** ................................................................................................... **1**

**ARGUMENT** ........................................................................................................... **2**

    **I.**    **Petitioners are likely to succeed on the merits** ...................... **2**

    **II.**   **Without relief, Petitioners will suffer irreparable harm** ................................................................................................. **6**

    **III.**  **The balance of equities and the public interest favor granting Petitioners' requested relief** ................................... **8**

**CONCLUSION** ........................................................................................... **10**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alcantara v. Archambeault*,
   No. 3:20-cv-00756-DMS-AHG (S.D. Cal. Apr. 30, 2020), ECF
   No. 38 .............................................................................................. 9, 10

*Alcantara v. Archambeault*,
   No. 3:20-cv-00756-DMS-AHG (S.D. Cal. May 1, 2020), ECF No.
   41 ............................................................................................................ 2

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ............................................................................ 2, 6

*Fraihat v. U.S. Immigration and Customs Enf't*,
   2020 WL 1932393 (C.D. Cal Apr. 20, 2020) ........................................... 4

*Helling v. McKinney*,
   509 U.S. 25 (1993) ................................................................................... 6

**Other Authorities**

U.S. Const. amend. V ..................................................................................... 2

U.S. Const. amend. VIII ...................................................................... 1, 2, 6

Kate Morrissey (@bgirledukate), Twitter (Apr. 23, 2020, 10:50 PM),
   https://twitter.com/bgirledukate/status/1253471366621196288 ............. 1

Kate Morrissey, *As Coronavirus Spreads in Federal Detention
   Center, Calls for Widescale Release Grow*, San Diego Union-
   Tribune, Apr. 12, 2020 ........................................................................... 10

Kate Morrissey, *Federal judge orders review for release of ICE
   detainees at Otay Mesa Detention Center due to pandemic*, San
   Diego Union-Tribune, Apr. 30, 2020 ....................................................... 1

Kenji Mizumoto & Gerardo Chowell, *Transmission potential of the
   novel coronavirus (COVID-19) onboard the diamond Princess
   Cruises Ship, 2020*, 5 Infectious Disease Modelling 264 (2020),
   https://sciencedirect.com/science/article/pii/S2468042720300063 ....... 10

Patricia Sulbarán Lovera, *Coronavirus: Immigration Detention Centres in Crisis*, BBC News, May 1, 2020, htttps://bbc.com/news/world-us-canada-52476131 ............................................. 8

# INTRODUCTION

Plaintiff-Petitioners' ("Petitioners") Motion for an Emergency Temporary Restraining Order and for Preliminary Injunction (ECF No. 2) has only become more urgent as COVID-19 continues to spread through the Otay Mesa Detention Center ("Otay Mesa") like wildfire. Since Petitioners commenced this action, at least 70 <u>additional</u> detained persons at Otay Mesa have tested positive for the virus—an increase of over 70% in a seven-day period.[1] Respondents do not dispute that detained persons at Otay Mesa are subject to conditions that endanger their health and safety in violation of their Fifth and Eighth Amendment rights. Nor do they dispute that they are unable to ensure that the Centers for Diseases Control and Prevention's ("CDC") most essential recommendations—social distancing and implementing hygienic practices—are possible within Otay Mesa. Instead, they attempt to distract from the ongoing, life-threatening constitutional harms Petitioners are experiencing with a red-herring jurisdictional argument that lacks any merit. Absent the emergency relief Petitioners have requested—provisional certification of the Pretrial and Post-Conviction Medically Vulnerable Subclasses and release of subclass members, subject to appropriate conditions—it is all but guaranteed that medically vulnerable persons in United States Marshals Service ("USMS") custody will contract COVID-19, exposing them to a potential death sentence.

---

[1] As of April 23, 2020, Otay Mesa had 97 confirmed COVID-positive cases among detained persons (38 persons detained by USMS and 59 persons detained by Immigration and Customs Enforcement ("ICE")). Kate Morrissey (@bgirledukate), Twitter (Apr. 23, 2020, 10:50 PM), https://twitter.com/bgirledukate/status/1253471366621196288. As of April 30, 2020, Otay Mesa had 167 positive cases in both USMS and ICE custody. Kate Morrissey, *Federal judge orders review for release of ICE detainees at Otay Mesa Detention Center due to pandemic*, San Diego Union-Tribune, Apr. 30, 2020, https://www.sandiegouniontribune.com/news/immigration/story/2020-04-30/judge-orders-review-for-release-of-ice-detainees-at-otay-mesa-detention-center.

# ARGUMENT

As described in Petitioners' Memorandum in Support of *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction (ECF No. 2-2) and below, Petitioners have shown that a temporary restraining order and/or preliminary injunction is necessary to prevent irreparable harm to the Medically Vulnerable Subclasses.

## I.     Petitioners are likely to succeed on the merits.

Respondents do not dispute that Petitioners have established a likelihood of success on the merits.[2] Specifically, they do not dispute that the Pretrial Medically Vulnerable Subclass—who are presumed innocent—are protected by the Fifth Amendment, and this Court has already found that the conditions at Otay Mesa violate the Fifth Amendment. *See* May 1 Order, *Alcantara v. Archambeault*, No. 3:20-cv-00756-DMS-AHG (S.D. Cal. May 1, 2020), ECF No. 41 (the "ICE Case"). Nor do Respondents dispute that members of the Post-Conviction Medically Vulnerable Subclass are protected by the Fifth Amendment, rendering their current treatment unconstitutional as well.

Even if the Fifth Amendment did not apply to the Post-Conviction Medically Vulnerable Subclass, the Eighth Amendment still protects them against the cruel and unusual conditions to which they are currently exposed, and which are far disproportionate to any underlying offense.[3] That is because the undisputed facts demonstrate that Respondents have "failed to act despite [] knowledge of a substantial risk of serious harm" arising from COVID-19. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

---

[2] Respondents' opposition (ECF No. 29) focuses on claimed jurisdictional defects. Respondents do not seriously contest that, if this Court has jurisdiction, the requested emergency relief is appropriate. Petitioners explain why the Court has jurisdiction to enter the requested order in their First Response to Respondents' Motion to Deny the Petition for Habeas Corpus and Injunctive and Declaratory Relief, filed concurrently herewith, and incorporate by reference all arguments made therein.

[3] Respondents do not dispute that Otay Mesa is "minimum/medium" security.

To take but one example, Petitioners are unable to practice adequate social distancing despite Respondents' awareness of CDC guidance advising that social distancing is the <u>only</u> effective measure to mitigate the risk of serious illness or death from COVID-19. In a cruel irony, Respondents have convened a series of Otay Mesa town halls to address the pandemic and instruct Petitioners to practice social distancing—yet Petitioners report that these meetings take place in a crowded room in which social distancing is impossible. Ridley Decl. ¶ 25 (ECF No. 1-4); Doe Decl. ¶¶ 20, 21 (ECF No. 1-5); Smith Decl. ¶ 13 (ECF No. 1-10). Respondents' own filings confirm that Petitioners are unable to practice social distancing, as more than half of the individuals detained in USMS custody at Otay Mesa still share cells with others, and one pod is still approximately two-thirds full. Johnson Decl. ¶ 14 (ECF No. 29-2). Finally, notwithstanding the fact that Otay Mesa is operating at an average capacity of 31 percent, *id.*, and that Respondents purport to recognize the clear risks COVID-19 poses, ECF No. 29 at 11–12, 17, every named Petitioner has, by sworn declaration, reported that social distancing remains impossible at the facility.[4] The size of certain pods renders social distancing virtually impossible even when they are at only half capacity. *See, e.g.*, Arreola Decl. ¶¶ 5, 6, attached hereto as Exhibit B to Declaration of J. McPhee (reporting, as of April 30, 2020— when B-Pod was operating at approximately 50% capacity— that "we cannot stay

---

[4] Alvarez Decl. ¶¶ 3, 10 (ECF No. 1-7); Broderick Decl. ¶¶ 9, 12 (ECF No. 1-8); Cano Decl. ¶ 5 (ECF No. 1-15); Crespo-Venegas Decl. ¶¶ 5, 6 (ECF No. 1-11); Gonzalez-Soto Decl. ¶¶ 8, 9, 10 (ECF No. 1-12); Lara-Soto Decl. ¶ 42 (ECF No. 1-9); Ramcharan Decl. ¶¶ 3, 8 (ECF No. 1-13); Ridley Decl. ¶¶ 4, 8 (ECF No. 1-4); Smith Decl. ¶¶ 6, 20 (ECF No. 1-10); Szurgot Decl. ¶¶ 10, 11 (ECF No. 1-6); Doe Decl. ¶ 5 (ECF No. 1-5). Beyond the inability to practice adequate social distancing, Petitioners are precluded from engaging in the level of personal hygiene recommended by the CDC to mitigate risk related to COVID-19. *See, e.g.*, Alvarez Decl. ¶ 6 (ECF No. 1-7) ("We are given hygiene supplies once a week. I get a small bar of soap, the size of a chocolate and a small amount of shampoo that has to last me all week. If we run out we can ask for more but sometimes were told the jail has run out and we have to wait for a new shipment. This week we were out of toilet paper for two days and were told we had to wait for a shipment. We are not given hand sanitizer."); Ramcharan Decl. ¶ 6 (ECF No. 1-13) ("They don't really give us a lot of hygiene products."); Ridley Decl. ¶ 10 (ECF No. 1-5) ("The cleaning supplies are highly diluted. The color should be darker. We do not have bleach.").

six feet apart from one another in B-pod because of the size and number of people"). Moreover, experts recognize that "a facility operating at less than full capacity does not mean that social distancing is possible. . . even if it is operating at only one third capacity," due to practices and factors at these facilities, including pat-downs by officers, shared restroom facilities, housing accommodations, and food distribution practices, among others. *See* Cohen Decl. ¶ 10, attached hereto as Exhibit A to Declaration of J. McPhee.

What is more, Respondents are incapable of providing appropriate treatment to the Medically Vulnerable Subclasses because they cannot even identify who qualifies as medically vulnerable. Not only have Respondents remained silent about how many detained persons in their custody are medically vulnerable, but they initially drastically undercounted the number of medically vulnerable individuals in ICE detention at the same facility before this very Court in the parallel ICE Case.[5] These non-exhaustive examples demonstrate that not only have Respondents acted with reckless indifference to the risk to Petitioners, but also that release of the Medically Vulnerable Subclasses is the only relief that will adequately protect them from such risk. As one Otay Mesa staff member stated in response to detained individuals' requests for COVID-19 testing, "Why do you want testing? There is nothing we can do anyway." Smith Decl. ¶ 23 (ECF No. 1-10).

Other emerging facts underscore that, despite Respondents' awareness of the dangers posed to Petitioners due to the COVID-19 pandemic, Petitioners continue

---

[5] Both in the sworn Warden C. LaRose Declaration in Support of Defendants' Opposition to ICE Case plaintiffs' TRO and during oral argument on the TRO motion in that case on April 28, defendants stated that there were 8 individuals in ICE custody who qualified as medically vulnerable, only to supplement their filings the very next day to indicate there were actually 51 to 69 ICE detained persons who met the CDC definition for individuals at high COVID-19 risk. *See* ICE Case, LaRose Decl. ¶¶ 37-39 (ECF No. 26-1); ICE Case Supplemental Briefing, at 2 (ECF No. 34). And the only reason Respondents even endeavored to identify the more accurate number was because of the court order in *Fraihat v. U.S. Immigration and Customs Enf't*, 2020 WL 1932393 (C.D. Cal Apr. 20, 2020) requiring the identification of medically vulnerable detained persons in ICE custody. No such order requires Respondents to identify medically vulnerable individuals held in USMS custody and they did not voluntarily do so here.

to be exposed to an unreasonable and substantial risk of serious harm to their health. Since Petitioners commenced this action, two recent Otay Mesa detention officers have come forward with civil actions validating the Petitioners' arguments. *See* Complaint, *Smith v. CoreCivic of Tenn. LLC et al.*, No. 20cv0808L (WVG), (S.D. Cal. Apr. 29, 2020) ("Smith Compl."), attached hereto as Exhibit C to Declaration of J. McPhee; Complaint, *Arnold v. CoreCivic of Tenn. LLC et al.*, No. 20cv0809 (BEN) (RBB) (S.D. Cal. Apr. 29, 2020) ("Arnold Compl."), attached hereto as Exhibit D to Declaration of J. McPhee. The allegations in the detention officers' complaints mirror Petitioners' declarations describing the impossibility of social distancing, the unavailability of PPE and basic cleaning supplies, and unsanitary cleaning practices.[6] They also corroborate Petitioners' core claim—that their continued confinement at Otay Mesa is unconstitutional in light of the severe and

---

[6] For example, both complaints state that it was impossible for detained persons—even with cohorting—to practice social distancing given the facility's layout, the number of detained persons in the housing units, and meal time practices. Arnold Compl. ¶¶ 91, 101–102 (Exh. D); Smith Compl. ¶¶ 65, 78 (Exh. C). Significantly, during plaintiffs' employment, there were shortages of the most basic sanitation supplies, including soap, shampoo, and hand sanitizer. *See* Arnold Compl. ¶ 40 (Exh. D). The shortages also included masks, which Otay Mesa allegedly did not want its staff wearing so as to not scare detained persons or other employees, and because they were "over budget" and would then have to also provide masks to detained persons. Arnold Compl. ¶¶ 103–104 (Exh. D); Smith Compl. ¶¶ 53–54 (Exh. C). Consistent with these allegations, Petitioners report that they were told they needed to use a single mask for either a week or two weeks: Gonzalez-Soto Decl. ¶ 16 (ECF No. 1-12) ("[The masks are] like paper, and they break down pretty quickly. They only gave us one, and they said we'd have to make it last two weeks."); Lara-Soto Decl. ¶¶ 17, 18 (ECF No. 1-9) ("Two days ago, the jail gave us new masks that were made with thicker material. They are the type of masks that are used by medical professionals. However, we were told that the masks would have to last for two weeks."); Cano Decl. ¶¶ 20, 21 (ECF No. 1-15) ("We just got the masks about four days ago (Friday). They made us sign a paper saying we received the mask and to take care of it. It said something about them not being responsible if something happens to the face mask. They told us we're responsible for it and we can't ask for another one, I guess because they did not have anymore. I have only gotten one mask. It is a cheap face mask. We told them it's not going to last forever when we breathe on it. They told us to take it off and wash them. I have not tried to wash mine because I am afraid it will come apart and they will not give me another one."). *See also* Kopycinski Decl. ¶ 9, attached hereto as Exhibit E to Declaration of J. McPhee. ("When I was taken back to Otay Mesa Detention Center, I was not provided a mask. When I got back I demanded a mask. I received a mask but I was unable to put it on due to the restraints. A CO came into the sallyport and removed his mask before removing my restraints.").

dire risk they necessarily face at the facility due to COVID-19 and Respondents' inability or unwillingness to comply with basic CDC guidance.

In sum, this Court can infer Respondents' knowledge for purposes of the Eighth Amendment standard from "the very fact that the risk was obvious," coupled with specific reports from inside the facility demonstrating that Respondents are aware of the threat, but are not taking adequate measures to prevent serious illness and needless suffering in the imminent future. *See Farmer*, 511 U.S. at 842; *Helling v. McKinney*, 509 U.S. 25, 33 (1993). This is more than sufficient to establish that Petitioners are likely to succeed on the merits of their claims, irrespective of whether the inquiry proceeds under the Fifth or Eighth Amendments.

## II. Without relief, Petitioners will suffer irreparable harm.

Respondents make two arguments that medically vulnerable persons will not suffer irreparable harm if exposed to a disease that has a more than 5% chance of killing them. Goldenson Decl. ¶ 9 (ECF No. 1-2).[7] Neither makes any sense.

First, Respondents argue that the harm to the Medically Vulnerable Subclasses is "speculative" because they are still at risk of COVID-19 even if they are released from Otay Mesa. This argument would be laughable, if the situation were not so dire. The CDC has issued clear guidelines on how medically vulnerable persons should mitigate their risk—primarily social distancing and careful hygienic practices—which are not possible at Otay Mesa. While this is common sense, Dr. Joseph J. Amon, an expert in infectious disease control, clinical care, and obligations of government related to individuals in detention settings, has opined that "[r]eleasing individuals at highest risk who can then self-isolate provides a significantly better likelihood of preventing infection, disease spread and death, both in the facility and in the community at large." Amon Decl. ¶ 53 (ECF No. 1-

---

[7] In the general population, COVID-19 has a fatality rate ranging from 0.3 to 3.5%, which is five to thirty-five times deadlier than influenza. Complaint ¶ 3; Goldenson Decl. ¶ 7 (ECF No. 1-2).

Reply in Support of Petitioners' Emergency Motion for TRO    20vc00782
6

3). Dr. Joe Goldenson, an expert on correctional health, has opined that "the exponential rate of infection for COVID-19 we are already seeing in the community would be magnified within Otay Mesa Detention Center. . . . Vulnerable individuals will suffer severe complications, including death, without major interventions." Goldenson Decl. ¶ 27 (ECF No. 1-2). Dr. Robert Cohen, a board-certified doctor in the field of internal medicine and an expert in the field of correctional medicine, has opined that, in the context of correctional settings where the risks of COVID-19 are particularly severe, "even if a facility promptly transported everyone who required hospitalization to local hospitals for treatment (as it should), those hospitals could quickly become overwhelmed, leading to shortages of critical healthcare both for people from the facility and for people in the community." Cohen Decl. ¶ 9 (Exh. A).

Second, Respondents argue that Petitioners will not suffer irreparable harm from being exposed to COVID-19 because they receive medical care in Otay Mesa that they may not otherwise be able to access. Besides being entirely speculative, it is clear that the medical care at Otay Mesa is inadequate to handle the current pandemic. For example, Otay Mesa's Medical Unit possesses only seven negative air pressure cells for positive or presumed positive individuals and can house only 38 individuals within unit. ICE Case, LaRose Decl. ¶ 51 (ECF No. 26-1). Given the 167 positive COVID-19 tests at Otay Mesa as of April 30, 2020, the Medical Unit cannot possibly care for all those who are ill, especially when one takes into account those requiring medical care for non-COVID-related illnesses. *See* Amon Decl. ¶¶ 43, 44 (ECF No. 1-3) ("I am concerned that, independent of the current public health crisis, OMDC has had significant challenges providing adequate medical care to individuals in their custody. There are indications that COVID-19 has put a severe strain on this already strained system."). On the contrary, numerous testimonials paint a bleak picture of the medical care provided to detained persons at Otay Mesa, both in ICE and USMS custody where medical facilities are shared.

ICE Case, LaRose Decl. ¶ 51 (ECF No. 26-1). *See, e.g.*, Arreola Decl. ¶ 8 (Exh. B) ("[P]aramedics took me to the medical clinic. I was placed in a room that did not appear to have been cleaned recently. The floor looked dirty. The bed looked dirty. Officer Bernal gave me a broom and some liquid cleaner so I could clean it myself. . . . In the bathroom adjacent to the room, there were feces in the toilet."); Kopycinski Decl. ¶ 9 (Exh. E) ("I was taken to medical that night. . . the room they put me in was filthy. I asked if the room had been cleaned. A CO went to get items to clean the room. I felt bad and offered to help clean. But, when I looked more closely at the conditions, I got scared because it looked really dirty with bodily fluids.").[8] Moreover, the response time of the medical unit at Otay Mesa is inadequate. For example, a detention officer waited hours for help despite repeatedly calling the medical unit for assistance after reporting that a detained person with flu-like symptoms was observed walking around his housing unit and potentially exposing everyone within the unit. Arnold Compl. ¶ 96 (Exh. D).

### III. The balance of equities and the public interest favor granting Petitioners' requested relief.

Respondents' argument in response to the final two factors—the balance of equities and the public interest—is that "Petitioners do not provide any information regarding viable housing options outside of OMDC, either for themselves or members of the putative class and subclasses, or whether they or members of any

---

[8] As a woman detained in ICE custody reported, "There is no medical assistance here, they don't take care of us, they tell us to gargle with salt water, that we are fine, that it is just a cold." *See* Patricia Sulbarán Lovera, *Coronavirus: Immigration Detention Centres in Crisis*, BBC News, May 1, 2020, https://bbc.com/news/world-us-canada-52476131. There are numerous other examples of instances of inadequate medical care among persons in USMS custody. *See also* Cano Decl. ¶ 15 (ECF No. 1-15) ("About two weeks ago, I had body aches, sore throat, and a headache. I signed up for sick call and they just told me to drink water, try to do exercise, stay in my cell, and take ibuprofen. They told me it was all in my head."); Crespo-Venegas Decl. ¶ 10 (ECF No. 1-11) ("I am afraid. We are hearing on the television that people are dying. So, I am afraid. People are getting sick and we are not doctors. People get sick with the flu, or whatever they have, and they are just sent back to the unit. They are not checking people out well, they are not checking their symptoms. Somebody goes to the doctors, and then they are just sent back to the pod. I am worried that they will contaminate others when they come back.").

such class would be deprived of access to food, means of personal hygiene, and medical care if released from OMDC." This is simply false. In actuality, all of Petitioners' declarations address housing and self-isolation plans in the event of release and demonstrate the feasibility of working through any such concerns. *See, e.g.*, Ramcharan Decl. ¶ 16 (ECF No. 1-13) ("If I got out, I would be able to stay with my aunt who lives in San Diego, and she would be able to pick me up from the Otay Mesa Detention Center to take me to her home. My attorney Lauren Clark has my aunt's number. I would have a room to myself so that I could self-isolate, and I would be willing to self-isolate for 14 days."); Alvarez Decl. ¶ 16 (ECF No. 1-7) ("If I got out, I would stay at half way house where the program has rules about self-isolating and I would be able to have more control over my hygiene and my health. My attorney Joanna Martin will help me get a bed."); Smith Decl. ¶ 3 (ECF No. 1-10) ("If released, I would live with my brother, in San Diego. My family will help me with a hotel room for a couple of weeks to quarantine."). Furthermore, Respondents do not explain why viable housing options and other basic needs could not be addressed through release plans appropriate to the individual circumstances of each Subclass member, as was ordered by the Court in the ICE Case. *See* ICE Case, April 30 Order (ECF No. 38).

Respondents further assert—with no support—that granting Petitioners' requested release would put others in the community at risk. On the contrary, an orderly release of persons detained at Otay Mesa will reduce the potential harm to the surrounding community. *See* Amon Decl. ¶ 52 (ECF No. 1-3) ("Reducing the overall number of individuals in detention facilities is necessary to facilitate social distancing for remaining detainees, lessen the burden of ensuring the safety of detainees and corrections officers, and preserving the stability of health care networks in the surrounding community.").

Detained persons, staff, and medical experts alike fear that Otay Mesa's lackadaisical approach is harming their families and the community. A staff

member at Otay Mesa told a reporter the public is "not getting the full story from my employer. If this virus continues to go on the way it's been going on, it's going to spread illness in the community."[9] Indeed, Dr. Chris Beyrer, an epidemiologist and professor at Johns Hopkins University, said everyone involved in detention, including detained persons, guards, and their families, are at risk because of how many detained persons are still inside.[10] Scientists estimate that, in confined settings like prisons and cruise ships, one person with COVID-19 will infect about 11 people, each of whom will infect up to 11 other people.[11] Respondent LaRose appears to concede that the spread cannot be controlled; according to his own staff, LaRose said words to the effect of, "look guys, when or if we get it, we're all going to eventually get it," following a mid-March briefing meeting for staff. Arnold Compl. ¶ 88 (Exh. D); Smith Compl. ¶¶ 70, 72 (Exh. C). Release is the best and only way to protect Subclass members, and the community.[12] The balance of equities and public interest therefore favor Petitioners.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully ask this Court to issue a temporary restraining order or preliminary injunction directing Respondents to immediately identify and release all members of the Medically Vulnerable Subclasses, pursuant to the procedures recommended in the Proposed Order.

---

[9] Kate Morrissey, *As Coronavirus Spreads in Federal Detention Center, Calls for Widescale Release Grow*, San Diego Union-Tribune, Apr. 12, 2020, https://www.sandiegouniontribune.com/news/immigration/story/2020-04-12/coronavirus-spread-in-otay-mesa-detention-center.

[10] *Id.*

[11] Kenji Mizumoto & Gerardo Chowell, *Transmission potential of the novel coronavirus (COVID-19) onboard the diamond Princess Cruises Ship, 2020*, 5 Infectious Disease Modelling 264 (2020) (evaluating transmission rate on a cruise ship, and comparing that infection rate to similarly confined spaces like hospitals, prisons, and churches), https://sciencedirect.com/science/article/pii/S2468042720300063.

[12] To the extent any corollary concerns, including flight risk or public safety, need to be addressed, appropriate procedures and conditions can be built into relief. *See* ICE Case, April 30 Order (ECF No. 38).

Reply in Support of Petitioners' Emergency Motion for TRO    20vc00782

| | |
|---|---|
| | Respectfully submitted, |
| DATED: May 4, 2020 | **ROPES & GRAY LLP** |
| | *s/ Joan McPhee* |
| | **JOAN MCPHEE**<br>(joan.mcphee@ropesgray.com)<br>**ALEXANDER B. SIMKIN**<br>(alexander.simkin@ropesgray.com)<br>**HELEN GUGEL**<br>(helen.gugel@ropesgray.com)<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>Telephone: (212) 596-9000 |
| | **NICOLE HOROWITZ**<br>(nicole.horowitz@ropesgray.com)<br>Three Embarcadero Center<br>San Francisco, CA 94111<br>Telephone: (415) 315-6300 |
| | **NATIONAL IMMIGRATION PROJECT<br>THE NATIONAL LAWYERS GUILD** |
| | **SIRINE SHEBAYA**<br>(sirine@nipnlg.org)<br>**MATTHEW VOGEL**<br>(matt@nipnlg.org)<br>2201 Wisconsin Ave, NW<br>Suite 200<br>Washington, DC 20007<br>Telephone: (617) 227-9727 |
| | **ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES** |
| | **MITRA EBADOLAHI**<br>(mebadolahi@aclusandiego.org)<br>**BARDIS VAKILI**<br>(bvakili@aclusandiego.org)<br>**SARAH THOMPSON**<br>(sthompson@aclusandiego.org)<br>**DAVID LOY**<br>(davidloy@aclusandiego.org)<br>P.O. Box 87131<br>San Diego, CA 92138-7131<br>Telephone: (619) 398-4187 |

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

**GABRIEL ARKLES**
(garkles@aclu.org)
**CLARA SPERA**
(cspera@aclu.org)
125 Broad Street, 18th Floor
New York, NY 10014
Telephone: (212) 549-2569

*Attorneys for Plaintiff-Petitioners*